FIRST NAT. BANK OF FAIRBANKS v. NOYES.

(Fourth Division.  Fairbanks.  April 2, 1917.)

No. 2038.

BANKS AND BANKING ☞253—NATIONAL BANKS—LIABILITY OF OF-
FICERS.

In an action by a national bank against one of its directors
to recover damages claimed to have been caused to the bank by
excessive loans and other illegal dealing with the moneys of the
bank, in violation of the provisions of the National Banking Act
(Act June 3, 1864, c. 106, 13 Stat. 99), the defendant director will
be permitted to show the nature and origin of the entire trans-
action; that at the time the acts complained of were done he
was a nominal director only, but other officials were in charge
of the bank's business and funds, and loaned or otherwise dis-
posed of the amounts in controversy, without his knowledge or
consent. *Held*, defendant neither knew of the violations charg-
ed, nor was he a party to the same. Case dismissed.

McGowan & Clark, A. R. Heilig, and J. L. McGinn, all of
Fairbanks, for plaintiff.

F. De Journel and Cecil H. Clegg, both of Fairbanks, for
defendant.

BUNNELL, District Judge.  The plaintiff is a national
banking association duly organized and existing under and by
virtue of the laws of the United States, engaged in a general
banking business at Fairbanks, Alaska.  Its paid-up capital
stock is $50,000, consisting of 500 shares of the par value
of $100 each, owned by six stockholders—R. C. Wood and
John L. McGinn each owning 230 shares, and George Hutch-
inson, W. T. Burns, Luther C. Hess, and Henry Riley each
owning 10 shares.  Its officers and directors, including Geo.
Hutchinson, its cashier, are the above-named stockholders.

On the 9th day of September, 1907, the officers and directors
of this institution were Samuel A. Bonnifield, its president,
John E. Bonnifield, vice president, C. J. Hurley, cashier, Frank
G. Manley, F. C. Noyes, the defendant herein, owning 10
shares, and William Brelle, also, directors.  Its capital stock
was practically all owned by Samuel A. Bonnifield and Frank
G. Manley.

On or about the 8th day of May, 1909, there was a sale and transfer of all the stock to E. T. Barnette and W. H. Parsons, who on the 4th day of May, 1910, sold and transferred all of said stock to R. C. Wood and John L. McGinn.

Five separate causes of action are stated against the defendant, of which the first is to recover the sum of $25,722.27 alleged to be damages sustained by the plaintiff on account of excessive loans made in violation of the provisions of the National Banking Act by the directors and officers of said bank, including this defendant, to an institution known as the "S. A. Bonnifield Bank"; the second is to recover from the defendant the sum of $5,627.93, alleged to be damages sustained by the plaintiff on account of the act of the directors and officers of said bank, including this defendant, in declaring a dividend in violation of the provisions of said act and thereafter appropriating the same to their own use; the third is to recover from the defendant the sum of $7,168.22, alleged to be damages sustained by the plaintiff on account of excessive loans made in violation of the provisions of the National Banking Act by the directors and officers of said bank, including this defendant, to an institution styled the "Bank of Cleary"; the fourth and fifth are to recover from the defendant the respective sums of $5,100 and $7,800, alleged to be damages sustained by the plaintiff on account of excessive loans made, in violation of the provisions of the National Banking Act, by the directors and officers of said bank to John W. Corson and Theo. Witte, respectively.

The defendant denies the separate and distinct existence of the institutions called the "S. A. Bonnifield Bank" and the "Bank of Cleary," and alleges that they were nothing more or less than branches of the First National Bank, belonging to and a part of said bank. The defendant also denies any violation on his part of any of the provisions of the National Banking Act respecting excessive loans or illegal dividends.

The First National Bank of Fairbanks was established on the 12th day of June, 1905, in accordance with the provisions of the National Banking Act. Its president, Samuel A. Bonnifield, directed its policy from the date of its organization until the 8th day of May, 1909, when all the stock was sold to E. T. Barnette and W. H. Parsons. Fairbanks as a placer mining camp was rich and flourishing. Its banks, of which there were three, dealt in gold dust—the principal resource of the

camp. Briefly, it was a typical mining camp of the North. Under such conditions one less daring than Bonnifield, who by the evidence is shown to have been somewhat of a plunger, would not have undertaken the organization and management of a national bank.

It is, therefore, not a matter of surprise to find this institution under the direction of Bonnifield following the system of private banks in exacting a rate of interest higher than that allowed by law, making excessive loans, competing with its rival banks in the purchase of gold dust, and taking many chances not contemplated by the terms of the act under which it was organized.

Two institutions soon sprang into existence on the creeks, known as the "Bank of Cleary" and the "S. A. Bonnifield Bank."

The Bank of Cleary was opened at Cleary City in March, 1906. The witness Hutchinson testified that while in the employment of the First National Bank as bookkeeper, at the direction of the president, Samuel A. Bonnifield, he opened the books of the Bank of Cleary, that his salary and expenses during the time he was engaged in opening the books of the Bank of Cleary were paid by the First National Bank, and that after the Bank of Cleary was closed he checked up the accounts and closed the books. The witness Rettig testified that, after Hutchinson opened the books, he (Rettig) had full charge of the bank as agent or manager until October or November, 1906, that he was given his position by Mr. Bonnifield, that he understood he was working for Mr. Bonnifield, that the Bank of Cleary was connected with and a branch of the First National Bank, that the Bank of Cleary shipped its gold dust to the First National Bank and did not receive any commission or profits for itself, and that the Bank of Cleary was run for the purpose of getting away from the national banking laws.

The witness R. C. Wood testified that through the First National Bank, the Bank of Cleary arranged for exchange with the American Savings Bank & Trust Company of Seattle and with the Western National Bank of San Francisco; that it got its funds in order to carry on business from the First National Bank, the first amount being $5,305 on April 5, 1906. It is further shown by the evidence that the directors of the First National Bank provided the fund for paying the depositors of this institution the amount due them when its

affairs were wound up. The evidence also shows that this bank loaned from time to time large sums of money to F. G. Manley, who was heavily interested in carrying on mining operations on the creeks.

The S. A. Bonnifield Bank was established on Dome creek in April, 1907.

The witness R. C. Wood testified, from the books of the S. A. Bonnifield Bank, that this bank had no capital stock; that the first item on the cash book of the S. A. Bonnifield Bank is under date of April 29, 1907, and is a credit to the First National Bank of cash in the sum of $4,500; that the books of the First National Bank contain a corresponding debit entry; that Samuel A. Bonnifield, as president of the First National Bank, arranged for exchange for the S. A. Bonnifield Bank with the American Savings Bank & Trust Company of Seattle and with the Morton Trust Company of New York. The witness Wood further testified that the S. A. Bonnifield Bank practically ceased to do business in the fall of 1908; that on the 15th day of February, 1909, the amount of its deposits was the sum of $5,668.10, the liability for the payment of which was assumed by the First National Bank.

The evidence discloses that these institutions were used entirely for serving the First National Bank. On their overdrafts with the First National Bank no interest was charged, and for their principal service—that of collecting gold dust for and forwarding it to the First National Bank—no profits were reserved for themselves. Loans made by them were authorized by the First National Bank. By their patrons they were considered to be a part of the First National Bank, and the public shared in the same belief. Through them loans and transfers of account were made, such as would not be permissible for the First National Bank to make, yet all for its profit and benefit; and, finally, when they ceased to exist, their ashes and records became the property of the First National Bank. They seem to have sprung full-grown from the corporate entity of the First National Bank, lived their lives in its service, and were buried in its family plot without ceremony. They have every indication of being a part of the First National Bank; no characteristic is lacking. And, were it not for the provisions of section 5190 of the Revised Statutes (U. S. Comp. St. 1916, § 9744), there could be no possible doubt upon this point. I take it that a national bank cannot establish

branch banks, except in the manner provided by statute. Therefore I must conclude that these banks must be held to be separate from the First National Bank.

On the 9th day of September, 1907, the defendant F. G. Noyes, at the request of Samuel A. Bonnifield, became a director of the First National Bank. Mr. Noyes was not a banker, and did not claim to be. He continued as a director until the 6th day of March, 1909. He testified that he believed these institutions to be a part of the First National Bank, and from the evidence, in so far as any question of intent or negligence is concerned, I am warranted in finding that he was justified in this belief. The cashier, Hurley, testified that they were a part of the First National Bank; and, as a witness for the plaintiff on direct examination, the witness E. W. Griffin, an accountant and a national bank examiner appointed to examine the affairs of the First National Bank, testified as follows:

"Q. Now, was there any claim made by the officers and directors of the First National Bank, or by Mr. Noyes and Mr. Bonnifield, as to how these banks were being run out there, as to whether they were separate and distinct institutions, or whether they were part and parcel of the First National Bank of Fairbanks? A. I was led to believe, when I first went into the bank, and afterwards, that they were separate from the bank here itself; but, when I got to investigating, I found they were part and parcel of the bank."

The Bank of Cleary and the S. A. Bonnifield Bank were in operation long prior to the time Noyes became a director. Bonnifield and Manley owned practically all the stock of the First National Bank. The record shows that Manley was extensively engaged in mining and was allowed heavy overdrafts with the Bank of Cleary, while the S. A. Bonnifield Bank carried loans and overdrafts of Bonnifield in excess of any amount permitted to be loaned by the First National Bank. The method of thus operating was known to Bonnifield, Manley, and Hurley. As necessity demanded, notes taken by the First National Bank were transferred to one or the other of these creek banks, and when the necessity for such transfer ceased to exist were returned. Clearly these officers were evading the provisions of the National Banking Act. The witness Griffin testified positively that he advised the defendant Noyes in September, soon after Noyes became a director, that these banks would have to be closed down, and that Bonnifield

was also advised.   Any such notification was as positively denied by Noyes; and the testimony of the witness Sproul shows that Mr. Griffin must be mistaken.   In June, 1908, Griffin claims to have made another examination of the First National Bank, but states that he did not notify Noyes about its condition.   Nor was the First National Bank without legal advisers, for the record discloses that the firm of McGinn & Sullivan served it at the rate of $250 per month.   To them Hurley testified that he went frequently for advice, and that he so informed Noyes.   There is nothing in all the evidence to show that Bonnifield, Manley, Hurley, Griffin, or McGinn & Sullivan ever notified Noyes of the method employed in making loans or of allowing overdrafts to the creek banks. His advice on such matters was not asked for, and was not wanted.   It is true that Noyes signed the reports to the Comptroller of the Currency dated December 3, 1907, February 2, 1908, May 14, 1908, and July 15, 1908.   These reports show an increase in overdrafts of the bank of Cleary from $83,733.-93 on December 3, 1907, to $140,556.08 on July 15, 1908, and of the S. A. Bonnifield Bank from $28,811.24 on December 3, 1907, to $72,583.05 on July 15, 1908.   The plaintiff has taken the position that this increase should have challenged the attention of the defendant, and, because no investigation was made by him, he is liable because of his negligence.   Noyes was bound to sign these reports.   The condition was not of his making.

"It is not enough to show that the condition existed.  A participation in the illegal acts must be shown, or such negligence as will bring the defendant clearly within the provisions of the act."

It has been shown that, where Noyes was consulted about making loans, he objected, stating that the depositors' money should not be loaned.   This was his idea, and therefore it seems he was not consulted.   The plaintiff takes the position that it is unnecessary to show how the overdrafts occurred, except in a few instances, and in brief says to the defendant:

"Here are the books.  They are your making.  You are bound by the results shown.  You have made the law of this case, and from you we are entitled to recover."

If the national bank examiner from his investigation found that these banks were a part and parcel of the First National

Bank, it would seem a harsh finding indeed to hold that, so far as the question of negligence is concerned, Noyes would be liable on that ground. He at least should not be held on the charge of negligence to be better advised than the bank examiner or the cashier, Hurley, who testified that the purpose of these two banks was "to compete with the other banks on the creeks in the purchase of gold dust and other business also, as far as they had to in the way of competing," and that "they were being maintained by the First National."

In addition, it has not been proven that Noyes was advised of the contents and import of the letter of the Comptroller of the currency under date of January 18, 1908. The letter signed by Noyes on the 1st of August, 1908, shows that he had notice of the contents of the Comptroller's letter of June 23, 1908. This letter, however, had not been called to his attention until after July 15, 1908. From August 1, 1908, efforts were made to comply with the instructions of the Comptroller, and the overdrafts were soon brought within the limits prescribed by law. Some complaint is made because the books of the First National Bank would show an overdraft on a date subsequent to August 1st, in excess of what it was on August 1st. The general result was to reduce the overdrafts, and finally to bring them entirely within the amount permitted by law. The plaintiff has not undertaken to show what caused the daily balances to vary after August 1st. At that time of the year it is reasonable to presume that gold dust was being collected for the First National Bank by the creek banks, and that cash to pay for the same had been remitted to the creek banks and charged to them before the shipments of dust reached Fairbanks.

I am therefore compelled by the evidence to find that the overdrafts, classed as loans, to those creek banks, were not made with the knowledge of the defendant, neither were they the result of intention on his part to violate the law, nor did they exist by reason of such negligence or acquiescence on his part as to render him liable in damages.

If Noyes was not liable under the provisions of the Banking Act for the existence of the overdrafts to the creek banks, I take it that under the allegations of this complaint he is not responsible for any loss occasioned thereby, but that it was his duty to exercise usual and ordinary care in seeing that the First National Bank reduced its losses to a minimum.

In its first cause of action the plaintiff charges:

Paragraph 3: "That said S. A. Bonnifield Bank was without capital or other assets, and from its opening until its close the capital, assets, deposits, and moneys of the said First National Bank were wrongfully, knowingly, and negligently loaned and used by the officers and directors of said First National Bank, in large sums, quantities, and amounts, in the establishing, carrying on, and conducting of said S. A. Bonnifield Bank. That said S. A. Bonnifield Bank carried on a general banking business, and was established, operated, and conducted, as aforesaid, by the officers and directors of said First National Bank of Fairbanks, for the purpose primarily of avoiding and evading the national banking laws of the United States, and particularly that part thereof which prohibited national banking associations from lending to any one person, corporation, or firm, more than ten per cent. of their paid-up capital and surplus."

Paragraph 5: "That upon the 15th day of November, 1907, the said S. A. Bonnifield Bank had a deposit of $600.02 with the said First National Bank. That upon the 16th day of November, 1907, the said S. A. Bonnifield Bank had an overdraft with said First National Bank amounting to the sum of $24,122.24. That from said 16th day of November, 1907, the said overdraft of the said S. A. Bonnifield Bank with the said First National Bank varied and increased in amounts from the 6th day of May, 1908, when it reached its maximum amount, to wit, the sum of $132,018.99. That from said 6th day of May, 1908, the amount of said overdraft varied and decreased until, on the 18th day of August, 1908, the amount thereof was the sum of $53,240.84. * * * That all said overdrafts were knowingly permitted to be made and exist by the officers and directors of said First National Bank, including this defendant."

It is further charged that on the 18th day of August, 1908, the officers and directors of said First National Bank permitted two credits to be applied on the above overdraft of $53,240.84, which credits amounted to the sum of $39,563.12, of which the first was "Stock, merchandise, and book accounts of Tanana Commercial Co., $20,291.52," and the second, "Warehouses Nos. 1 and 2, $19,271.60"; that the value of said credit entries proved to be of the value of $19,943.86 only, thereby causing a loss of $19,619.26. Paragraph 9 charges:

"That from said 18th day of August, 1908, until the close of said S. A. Bonnifield Bank, the apparent overdrafts of said S. A. Bonnifield Bank, as they appeared upon the books of said First National Bank, varied in amount, sometimes being in excess of the statutory limit and sometimes within it, until, upon the 15th day of February, 1909, the apparent amount thereof was the sum of $6,103.01." That said sum of $6,103.01 has never been paid, and that there has therefore been a total loss by virtue of said excessive loans amounting to $25,722.27.

Prior to the time Noyes became a director of the First National Bank, the Tanana Commercial Company had executed its notes to the First National Bank between the dates of January 7, 1907, and September 3, 1907, amounting to $14,500. On the 22d of January, 1908, the Tanana Commercial Company was further indebted to the First National Bank for overdrafts amounting to $5,249.26, and interest thereon of $542.26, making a total indebtedness of $20,291.52.

From the mass of testimony presented, the plaintiff in its brief has made a careful statement of just what transpired on the 22d day of January, 1908. (Plaintiff's Brief, page 68):

"Upon that date the First National Bank charged the S. A. Bonnifield Bank with the sum of $20,291.52, and the S. A. Bonnifield Bank in turn charged the individual account of S. A. Bonnifield with said sum of $20,291.52. So then, as far as the records of the S. A. Bonnifield Bank and the First National Bank are concerned, as well as by the note and mortgage given to S. A. Bonnifield, the Tanana Commercial Company became indebted to S. A. Bonnifield in the sum of $20,291.52, S. A. Bonnifield became indebted to the S. A. Bonnifield Bank in a like amount, and the S. A. Bonnifield Bank became the debtor of the First National Bank in the same amount."

The plaintiff insists that this was a complete novation of contract, behind which no inquiry, even in an equitable action, can be made.

Section 9 of the by-laws provides as follows:

"The president of the bank shall be responsible for all such sums of money and property of every kind as may be intrusted to his care or placed in his hands by the board of directors or by the cashier, or otherwise come into his hands as president, and shall faithfully discharge his duties as such president, and faithfully and honestly apply and account for all sums of money and other property of this bank that may come into his hands as such president, and pay over and deliver them to the order of the board of directors, or to any other person authorized by the board to receive them."

I have no doubt that it was the purpose of Mr. Bonnifield on the 22d of January, 1908, to get the account of the Tanana Commercial Company off the books of the First National Bank, and that the transfers made were with that sole object in view. Of this transaction Noyes was not advised, neither was he consulted concerning it; and on the 18th of August, 1908, when the item of $20,291.52 was transferred to the First National Bank, it was the best way of putting it where it properly belonged. If Bonnifield did not discharge according

to law the obligations of his trust with respect to this transaction this plaintiff could have instituted long ago a proper action to recover its losses.

When advised that losses had been sustained on account of the dealings of the First National Bank with the creek banks, the dividend which Noyes was entitled to receive from the First National Bank he donated to its use.

By its second cause of action the plaintiff seeks to recover from the defendant the sum of $5,627.93 damages alleged to have resulted by declaring and paying a dividend in violation of the provisions of the National Banking Act, whereby its capital was impaired to the extent of the above-mentioned sum. The contention is that the capital stock, surplus, and undivided profits of the First National Bank, as shown by the books of the bank on the 13th day of February, 1909, was the sum of $142,822.27. From this amount is to be deducted the capital stock of $50,000, 20 per cent. of this amount, or the sum of $10,000, and all bad, worthless and uncollectible loans, discounts and accounts, which were more than six months past due, and upon which no payment of principal or interest had been made within six months, and which were not well secured, or in the process of collection, and which never were paid. The list of such loans, discounts, and accounts is alleged to be $48,450.67. The evidence shows that of this amount the sum of $281.27, designated "Albrecht taxes," should be deducted, leaving a balance of $48,169.40. So that, if there were no other assets that could be considered in declaring and paying a dividend of $40,000, it would result in an impairment of the capital stock of the First National Bank in the sum of $5,346.66.

The witness Hurley, cashier of the First National Bank at the time the dividend was declared, testified that on that date the accrued interest would amount to approximately $9,000. It is also shown that on that date there was in the custody and control of Samuel A. Bonnifield, the president of the bank, numerous other assets subsequently turned over to the bank, among which one, the item designated "Smallwood mortgage," has produced for the First National Bank the sum of $17,285.-16. It is true that it was entered on "Bonds and Securities Account" for $1 only; but I take it that, in an equitable action such as this, the court will concern itself with facts rather than fictions and absurd technicalities.

The plaintiff contends that these assets, the list of which totals the sum of $43,144.57, in addition to accrued interest to April 28, 1909, amounting to $13,950.14, marked Plaintiff's Exhibit V, and headed "Other Assets Not Shown on Books," was in the nature of some kind of a present or donation made by Mr. Bonnifield at the time the stockholders sold their stock. The first item on this list reads:

"S. A. Bonnifield, trustee, a/c gold dust Cascaden matter, $24,-637.68."

There is no testimony to show that these assets were the personal property of Bonnifield. In the very nature of things it is altogether more reasonable to presume that these assets were the property of the bank in the hands of Mr. Bonnifield as president, acting under the provisions of section 9 of the by-laws (Plaintiff's Exhibit V), than to presume, as suggested by plaintiff, just something thrown in to make the deal go.

In its third cause of action the plaintiff seeks to recover from the defendant damages in the sum of $7,168.22, alleged to have been caused by excessive loans to the Bank of Cleary by the officers and directors of the First National Bank, including this defendant, in violation of the provisions of the National Banking Act. The evidence shows that on the 29th day of October, 1907, the Bank of Cleary was indebted to the First National Bank in the sum of $25,421.66. C. L. Carlson owed the First National Bank the sum of $6,253.68 and the Bank of Cleary the sum of $22,690.01. On the 30th of October the First National Bank transferred the indebtedness of Carlson to it to the Bank of Cleary, so that on said date the books of the Bank of Cleary showed Carlson indebted to it in the sum of $28,973.69. On the same day the account of Carlson was transferred to the First National Bank, with the result that Carlson appeared indebted to the First National Bank in the sum of $28,973.69, and the Bank of Cleary had a credit balance. Samuel A. Bonnifield on the same day paid the First National Bank $20,000 on the Carlson account and took Carlson's note for $8,973.69. Various transfers of the Carlson note were made between the First National Bank and the Bank of Cleary subsequent to October 30, 1907, until on the 13th day of December, 1907, Samuel A. Bonnifield took a new note from C. L. Carlson in the sum of $10,158.22, on which there has been collected the sum of $2,990, leaving an unpaid balance

of $7,168.22 and interest. Although this note was payable to Bonnifield, the whole series of transactions show it was the property of the First National Bank. It was subsequently indorsed "without recourse" and delivered to the First National Bank.

The court is not justified in giving these transactions the strained constructions sought by the plaintiff, to establish a loss in the sum of $7,168.22 by reason of excessive loans to the Bank of Cleary, in violation of the provisions of the National Banking Act. The situation was simply this: The Bank of Cleary owed the First National Bank. Carlson owed the First National Bank and the Bank of Cleary. On the same day S. A. Bonnifield undertook the payment of $20,000 of Carlson's indebtedness, and took Carlson's note in the sum of $8,973.69, with the result that the Bank of Cleary had a credit balance with the First National Bank. This sum of $8,973.69 was less than 10 per cent. of the capital and surplus of the First National Bank, even considering the capital and surplus to be only $115,000. This is also true of the note given by Carlson on the 13th of December, 1907, in the sum of $10,-158.22.

It must be borne in mind that Carlson, on the 29th of October, 1907, was indebted to the First National Bank in the sum of $6,283.68, of which amount the sum of $583.68 was usurious interest, and that in the note of $10,158.22, in addition to the above sum of $583.68, there is the further sum of $1,-184.53 usurious interest. I take it that section 687 of the Compiled Laws of Alaska, in connection with R. S. §§ 5197, 5198 (U. S. Comp. St. 1916, §§ 9758, 9759), is to be followed and observed in any and every action where it is shown to the court that usurious interest has been charged.

Section 687 is as follows:

"If it shall be ascertained in any action brought on any contract that a rate of interest has been contracted for greater than is authorized by this chapter, either directly or indirectly, in money, property, or other valuable thing, or that any gift or donation of money, property, or other valuable thing has been made or promised to be made to a lender or creditor, or to any person for him, directly or indirectly, either by the borrower or debtor, or any person for him, the design of which is to obtain for money so loaned, or for debts due or to become due, a rate of interest greater than that specified by the provisions of this chapter, the same shall be deemed to be usurious and shall work a forfeiture of the entire interest on

the debt. The court before which such action is prosecuted shall render judgment for the amount due, without interest, on the sum loaned or the debt contracted, against the defendant and in favor of the plaintiff and against the plaintiff for costs of action, whether such action be contested or not."

Take, then, this balance of $7,168.22, and deduct from it the sum of $1,768.21 usurious interest, and we have the sum of $5,400.01, being $299.99 less than the note of $5,700 due the First National Bank on the 29th day of May, 1907. This note of $5,700 includes $700 of usurious interest, for on October 29, 1906, seven months prior, the amount was $5,000 only. How, then, can it be said that there is a loss resulting from excessive loans to the Bank of Cleary in this cause of action? The amount now legally due from Carlson is less than his note given to the First National Bank after Noyes became a director.

"Although payments made on a note are first to be applied in settlement of the interest, if the interest is usurious, the amount so paid will be applied on the principal." 39 Cyc. 1026.

In an action by a national banking association against one of its directors to recover damages alleged to have been caused by an excessive loan, in violation of the provisions of the National Banking Act, the directors will be permitted to show the nature and origin of the entire transaction, and usurious interest found to be included with the principal of the note will be deducted in determining whether or not the loan is excessive.

Furthermore, it is not shown by the evidence that the defendant Noyes either knowingly or negligently participated in, consented to, or in any way acquiesced in any of the matters set forth in this cause of action. The president and the cashier alone seemed to have consummated all the transactions testified to without consulting with any of the directors, and it is further shown by the evidence that the defendant had no knowledge of what actually did occur until after this suit was instituted.

In its fourth cause of action the plaintiff alleges:

"That upon the 17th day of July, 1908, and up to the 15th day of August, 1908, the officers of the First National Bank, with the

knowledge, consent, acquiescence and approval of its board of directors, loaned to J. W. Corson the sum of $14,500."

The evidence discloses that between the dates above mentioned one J. W. Corson and his political manager drew sundry drafts that were cashed by the cashier of the First National Bank in the sum of $14,500. In May, 1908, F. G. Manley, one of the directors of the First National Bank, paid on account of the above drafts the sum of $4,000. On the 30th of September, 1909, he paid the further sum of $5,100 in pursuance of an agreement entered into by the First National Bank and himself, which is as follows:

"This agreement, made and entered into this 23d day of September, 1909, by and between the First National Bank of Fairbanks, Alaska, party of the first part, and F. G. Manley, of the same place, party of the second part, witnesseth:

"That whereas a controversy has heretofore existed between the party of the first part and the party of the second part in regard to the liability of the party of the second part for certain moneys advanced to John W. Corson by the party of the first part, and which is evidenced by certain drafts;

"And whereas, the controversy that has existed between the parties hereto has this day been settled, it being agreed between the party of the first part and the party of the second part that they should share any loss that may be sustained on account of said drafts or moneys advanced to the said John W. Corson, equally;

"And whereas, there is now due upon said drafts the sum of $10,200, and, according to the terms of the agreement entered into between the party of the first part and the party of the second part, the party of the second part is to give his note to the party of the first part for one-half of said amount, to wit, the sum of $5,100;

"And whereas, said party of the second part has complied herewith by giving his said note;

"And whereas, it is further agreed between the parties hereto that any and all moneys that shall be collected from the said John W. Corson on account of said drafts, or on account of a judgment recovered against him in Seattle, state of Washington, shall be shared by the party of the first part and the party of the second part, equally:

"Now, therefore, this agreement witnesseth that the party of the first part, for and in consideration of said note of five thousand one hundred dollars ($5,100), does hereby release the party of the second part from any further liability upon said drafts, or for money advanced to the said John W. Corson by the party of the first part, and does hereby agree to and with the party of the second part that one-half of any money that shall be collected by said party of the first part upon said drafts or upon any judgment that has been or may be hereafter recovered against the said John W. Corson

shall be turned over or credited to the account of the party of the second part.

"In witness whereof the parties have hereunto set their hands this the day and year first above written.

"First National Bank,

"By C. J. Hurley, Pres.

"F. G. Manley,

"By Henry Riley, Atty. in Fact.

"Witnessed by E. Lewis Kavanaugh,

    "M. Goodman."

The evidence does not show that the defendant Noyes knew anything about the cashing of the J. W. Corson drafts, or in fact could have known anything about the cashing of them, unless he had actually been present at the time the cashier paid out the money. I quote the testimony of the witness C. J. Hurley upon interrogatories propounded by Mr. De Journel, attorney for the defendant:

"Q. Did you ever consult with Mr. Noyes about cashing these drafts? A. No, sir.

"Q. Did you ever inform him that they were cashed? A. Yes, sir; after they came back.

"Q. When was that, about? A. I can't say how long after they were returned unpaid.

"Q. A month or two, or three, or what? A. I should say within a month, anyway.

"Q. But you never did before you cashed these drafts, did you? A. No, sir; I don't think I said anything to Mr. Noyes about it until I had seen Mr. Manley and he had repudiated them, and then I informed Mr. Noyes about the transaction. But how long that was I couldn't say, because Manley was not here sometimes for long intervals."

Also the testimony of Noyes, the defendant, upon interrogatories propounded by Mr. De Journel:

"Q. Now, tell us what you know about the Corson matter, Mr. Noyes—the Corson drafts. When were you apprised for the first time that there was such an account? A. I can't fix the exact time. I don't remember just how it came up, but there was something said. Mr. Hurley, I think, spoke to me about it, and said that these drafts were returned.

"Q. He must have told you that the drafts had been cashed for Corson? A. Yes; there were some drafts cashed for Corson, and they were returned. And I said, 'Instead of you cashing the drafts, why didn't you have the money wired to the credit of the bank in Seattle, if he had money out there?' He said, 'Well, Manley came in here and guaranteed—said it was all right and absolutely perfectly good,' and he said, 'I done it.'

"Q. That was when? A. I can't fix the time.

"Q. That was after the drafts had come back? A. After the drafts was returned from Seattle, repudiated, or from Nome, or wherever they were sent. I don't know as he told me. But they were returned here."

"To hold a director liable for excessive loans, it is not enough to show that after the loan was made the director knew of it. The act of making the loan, consenting to it, agreeing that it be made, is the knowledge imputable to a director, and not knowledge that it had been done."

It is also to be noted that in this cause of action, as well as in the fifth cause of action, it is alleged that the excessive loans were made "with the knowledge, consent, acquiescence, and approval of its board of directors"; whereas, in the first, second, and third causes of action it is alleged that the illegal acts were committed "with the knowledge, consent, and acquiescence of its board of directors, including this defendant."

Plaintiff seeks to recover on its fifth cause of action on account of excessive loans made to Theodore Witte. The first loan was January 14, 1909, for $3,000; the second loan January 28, 1909, for $4,320, $320 of which is proven to be usurious interest; and the third, February 8, 1909, for $3,500, making a total of $10,500. It is admitted by the plaintiff that the capital and surplus of the First National Bank on the 8th day of February, 1909, was $115,000. The amount of $10,-500 was clearly within the provisions of the National Banking Act. Thereafter, on the 5th day of March, Witte's overdraft amounted to $1,203.43, which was paid on the 8th day of March, 1909. The complaint alleges that Noyes was a director "up to the 5th day of March, 1909." Furthermore, it is not shown by the evidence that Noyes, as one of the directors of the First National Bank, knew anything about the loans and overdraft, consented to them, acquiesced in their existence, or approved of them. And the plaintiff in its complaint does not specifically so charge.

It must be borne in mind in this case that the corporation has instituted and is prosecuting the action to recover damages for itself. Once since the date of its organization it seems to have been in financial difficulty. This was during the panic of 1907 and 1908, when for a few months it was forced to issue "scrip," all of which was soon redeemed. Noyes was a director during this period, and was principally concerned, as he has testified, in seeing that the bank kept open and that

there was no loss to its depositors or general creditors. Such action on his part is worthy of consideration in a case such as this, where it is charged that he was knowingly, willfully, and negligently avoiding the provisions of the law.

The condition existing when he became a director was not of his making. The plaintiff contends that he was negligent, in that he did not at once inquire into the details of the management of the bank. The evidence in this case discloses that it has taken the present officers of this bank several years to determine whether or not an action should be instituted against the defendant. Attorneys, bank examiners, and accountants, after extended investigation of a mass of records, in which they were aided by subsequent developments of the bank's transactions, finally, five years after Noyes ceased to be a director, arrived at the conclusion that he was negligent in the discharge of his duties during his brief directorate.

The Comptroller of the Currency wanted the bank kept open, if possible. It was only natural that during a financial panic Noyes' attention should have been directed to a vigorous effort to keep the bank open and see that the depositors were safe. This was of paramount importance. Any other course would have been exceedingly ill-advised, and probably would have been disastrous to all concerned.

Suppose Noyes had proceeded upon the course of investigation suggested by counsel. Naturally he would have turned to the bank examiner, Griffin, and the cashier, Hurley, who have testified that the creek banks were a part and parcel of the First National Bank. The bank had a firm of competent attorneys to represent it. Its solvency was not questioned. Under such conditions I cannot find that Noyes was negligent because he failed to initiate the now after-thought suggestions upon which plaintiff lays so much stress.

The overdrafts with the creek banks were allowed by Hurley, the cashier, without consulting with Noyes in any way, and the records disclose that the loans made by them were authorized by the First National Bank. The exact nature of the transactions making up each day's business is not shown, except generally. The witness Wood testifies that it came about in numerous transactions—the shipment of cash to the S. A. Bonnifield Bank, the cashing of their checks, and the transaction of other business for their account.

In the first instance Bonnifield and Manley owned practical-

ly all the stock. Then there was the sale to Barnette and Parsons, who in turn sold to Wood and McGinn. Hurley negotiated the sale to Barnette and Parsons, not on the offer of Bonnifield and Manley to sell, but, as the evidence shows, at the instigation of Barnette and Parsons to buy. There was a thorough investigation of the assets of the bank, resulting in Barnette and Parsons seeking to make part of the payment in securities held by the bank. The negotiations were off for several days, but were reopened, with the result that Barnette and Parsons accepted the doubtful accounts and notes and paid $250 per share for the stock. Wood declined to accept employment from Barnette and Parsons unless he was given an option on all this stock. Barnette and Parsons bought all the stock, and from them Wood took an option to purchase all the stock, and after working nearly a year he and McGinn took up the option, paying $250 per share. McGinn had been one of the bank's attorneys for several years, while Wood, with years of experience as a banker, was for nearly a year in the employment of Barnette and Parsons in the bank, and must have been thoroughly conversant with all of its affairs.

The following testimony of Hurley undoubtedly shows what happened when Barnette negotiated for the purchase of the stock:

"Q. What took place, then, when the negotiations began? He proposed to you to purchase? A. He proposed to purchase the stock, but wanted to pay me with some of the paper which he considered doubtful, and which I maintained was good. So, of course, I wouldn't sell the stock and receive in payment notes that he considered doubtful. And the negotiations were off for a matter of several days or a week. I supposed it was at an end then, when they came back again and wanted to open up negotiations.

"Q. Did you reopen the negotiations? A. Yes, sir.

"Q. With what result? A. The sale of the stock.

"Q. What about the doubtful accounts and notes? A. They accepted them all.

"Q. Such as they were? A. Just as they were; yes, sir.

"Q. Can you connect that with the indorsement of that note of Carlson? A. I indorsed that note, 'Payable S. A. Bonnifield, without recourse,' so that they couldn't come back on him.

"Q. That was spoken about and discussed with him? A. Yes, sir.

"Q. And his people, was it not? A. Yes.

"Q. Were the other accounts treated in the same way, or were they not? A. Yes, sir.

"Q. They were? A. Yes, sir."

In the face of this testimony, how can it possibly be contended that when this stock was sold it was the intention of the directors to sell, and of the purchasers to acquire, any claim of any kind against the directors for mismanagement, even assuming that, as directors, they were liable? The presumption would be, even were it not for this testimony, that any possible claim against the directors was fully considered, and the price for the stock fixed accordingly. There is no charge of deceit, no individual stockholder claims to have been misled, the Comptroller of the Currency is not seeking to close the institution, and no depositor or general creditor alleges a loss. This is not a case where, through a misapplication of funds in the hands of the directors or incompetent employés, or by defalcations and embezzlements, the savings of a host of depositors have been snatched from their grasp forever; but it is, on the other hand, a case where a corporate entity seeks to recover from a director for its present stockholders what in equity and good conscience the said stockholders, either individually or collectively, could not and should not recover in their individual rights.

The First National Bank, so far as the evidence discloses, is not and never has been insolvent. Large dividends were paid prior to its ownership by Barnette and Parsons, and since then its profits and dividends have been of such proportions that strenuous objections were made on the part of the plaintiff when the defendant sought to ascertain the amount thereof, and it was agreed that the record should show only that it had paid dividends under the present management.

In one respect, at least, this case seems as remarkable as it is unique. The plaintiff proves to the court by an overwhelming mass of testimony the knowledge and intention of Bonnifield, Manley, and Hurley, not parties to this action, to avoid and evade the provisions of the National Banking Act, and by the same testimony conclusively establishes the fact that the defendant neither knew of the violations charged, nor was a party to the same. Had such an action been brought against Bonnifield, Manley, Hurley, and Noyes, and had the same testimony been presented, at the conclusion of the trial I am forced to believe that a motion to dismiss as to the defendant Noyes would not have been seriously resisted by the plaintiff.

In reaching a decision in this case the court has been greatly assisted by the extensive and comprehensive briefs submitted

by the attorneys for the respective parties herein. Particular attention has been given to a careful consideration of Briggs v. Spaulding, 141 U. S. 132, 11 Sup. Ct. 924, 35 L. Ed. 662, Yates v. Jones National Bank, 206 U. S. 158, 27 Sup. Ct. 638, 51 L. Ed. 1002, Thomas v. Taylor, 224 U. S. 73, 32 Sup. Ct. 403, 56 L. Ed. 673, and Jones National Bank v. Yates, 240 U. S. 541, 36 Sup. Ct. 429, 60 L. Ed. 788. It necessarily follows that the respective causes of action Nos. 1 to 5, inclusive, will be dismissed. Findings in accordance with the views herein expressed may be prepared and submitted.